4-15-0088WC. Michael Durbin v. Archer v. Cain v. Midland. Clearly accountable for the appellant. Zero stops for the appellant. Members of the Court, I represent the employee of ADM, Mr. Durbin, in this case. And my position is that it's not a manifest way case. This is strictly a legal issue as to whether or not the evidence or the testimony of the treating doctor should have been admitted into evidence. In this case, it was excluded. In the... Who's the treating doctor? Excuse me? Who was the treating doctor? Dr. Gumpert. His testimony was not admitted in this record? No. He's a board-certified pulmonary expert. Treated the petitioner for eight years, and his evidence was excluded. Can you identify where on the record it indicates that it was excluded? Well... Yeah, I don't see that. The arbitrator adopted the written proposed decision of ADM, which discusses the importance of the Frye case on the exclusion of witness. But the arbitrator in that particular decision doesn't have a definite statement. But in the record, if you go through his deposition that's in the record, the deposition of Dr. Gumpert, and I have the pages, but every time the objection was made, the arbitrator went through the deposition and marked sustained. So from that, from the record, it's obvious that he wasn't considering the deposition of the testimony of the treating doctor. And he excluded it under Frye. Was there... you say there are notations contained on the transcript of the deposition? The transcript of the deposition shows the arbitrator wrote in sustained on the side of the page where the objections were made by the respondent that the opinion be excluded because it was a violation of Rule 702. He struck the entire deck? He struck all the opinions in the deck. In other words, the key opinion that the doctor has about causal connection... I need to get my reading glasses. Here. This is the most crucial question. The doctor, based upon a reasonable degree of medical certainty as to the last time you saw him, based on the history given to you by him, as to the condition he encountered at work, your review of the past medical records, your review of the material safety data sheets, your review of medical literature and treatments concerning exposure to butter, flavorings, and chemicals, and based upon the medical treatment you provided to him, do you have an opinion as to whether there's a causal connection between exposures to chemicals at work and the condition you provide a treatment for? Doctor's answer is yes. And my conclusion is that the exposure was causation. And right next to Mr. Stock's objection, Rule 702, foundation regarding history, and both objections were sustained. And the arbitrator writes that in on the page 36. Can you read the objection to me again? What was the objection? Rule 702 and foundation regarding history. Is that an objection to the opinion or only an objection to the testimony as to the history? It's an objection to his testimony regarding opinion regarding causation. What is the word history doing in the objection then? I have no clue. You have to ask him. If he has sustained the objection, then why does the arbitrator go on and go page after page of discussing Dr. Gumpert's testimony and the efficacy of it if he didn't consider it? Because he signed ADM's proposed decision because he didn't have time to write his own. And resigned shortly thereafter to become state's attorney in southern Illinois. All these facts are a record? How do we know this? You have to know arbitrator Sonati to know that he's no longer an arbitrator. Yeah, but the only thing that we can go by is what's in the decision. We can't go by what's in the record is he sustained the respondent's objections based on Fry. Which I would like to argue if you'll let me continue this. Well, one other thing. You say that there were two bases, foundation and Fry. Do we know which basis the objection was sustained on? It wasn't just that. There's one after another. Okay. Here's on page 33 of the deposition. He talks about diacentral, the doctor. And again, is that primary factor you discovered was that Mr. Durbin was exposed to artificial butter flavoring? Yes. And again, how significant is that to you? Why is that significant? Because it's becoming better and better known that butter flavorings, i.e. diacentral, induce lung disease. Exposures induce lung disease. And that's certainly based upon a reasonable degree of medical certainty. Yes. Mr. Stocks, objection to strike rule 702. Generally, accepted science, foundation, and penciled in the side is sustained. And then there's others, if you want to hear others. I'm sorry, but I was just going to say, again, at a trial, if there are multiple bases given in terms of an objection, and any one of them is a valid basis for sustaining the objection, then there's no abuse of discretion by the judge. In this circumstance, what I'm asking is, was there any indication as to which basis the objection was sustained on? You say it's just handwritten in the margins. It's handwritten in the margins, and if you read the opinion of the arbitrator, which was adopted from the proposed decision of ADM, it discusses time and time again why Frye should apply to exclude his evidence, the evidence of the doctrine, the testimony. Yeah, but here's what you're asking us to do. Think about this for a second. The arbitrator, the record contains detailed findings of fact and conclusions of law in an order signed by the arbitrator. Am I wrong about that or not? No, you're right. Okay. So you're saying, judges, you ignore, the arbitrator signed it, obviously. You're saying he didn't read it, okay, and we shouldn't pay any attention to it. We have a signed decision, detailed decision by the arbitrator, signed by him in the record, and you're asking us to ignore that because you are telling us he didn't read it. No, I didn't say he didn't read it, but the record also includes the proposed decision of ADM, which is word for word the arbitrator's decision. Okay, well, maybe he adopted it in his findings. No, I know that's exactly what he did. He told us he was going to adopt one or the other. Hold on one second. What you should be calling our attention to is the conclusions of law written by the arbitrator where he says, after evaluating the admissibility of opinion testimony, the way to be accorded to the testimony of competing experts, the credibility of the petitioner, and the totality of legal and factual circumstances presented where the arbitrator finds that you failed to meet your burden. He then talks about, in Illinois, the admission of expert testimony is governed by FRI, goes through a statement of FRI, what's commonly accepted, and then writes the following sentence. Based upon the record, Dr. Gumpert's opinions diagnosing an occupational disease and opinions relating to a workplace cause for fixed obstruction lung disease are insufficient for petitioner to meet his burden of proof. And it's after he says the proponent of expert testimony, the burden of establishing the proper opinion, is worthy of admission and evidence. So it appears as if there may be some merit to your argument that the arbitrator, although he recounted Gumpert's opinions, he actually found that they were inadmissible. Because of FRI. Let me make this suggestion. Obviously we have to mull over your point on that. But should we decide your position doesn't carry the day regarding the arbitrator, you might want to spend at least a few minutes telling us why it was wrong on the merits. Assuming that you did the right thing. Let me tell you why he's wrong first on FRI. Can I do that? Sure. Okay. Basically, the scientific evidence that we're talking about is whether diacentral causes COPD. And that's accepted scientific fact. There's no dispute about that. And that was found in the popcorn cases in Missouri. The issue is whether there's sufficient exposure in certain environments, whether they're flavoring plants, coffee mills. This is still under study by NIOSH and the scientists. So it's new science. This is the first diacentral case that I'm aware of in Illinois. So we're talking new science. So the issue of exposure and what degree is sufficient is a factual issue in terms of causation. And I think you're probably right so far, but I'm just jumping ahead because the time is limited. And I think I have a feeling what your opponent is going to say because it was commented in the record. They're saying that your client, to be candid, completely exaggerated his exposure. And they have witnesses from the company saying he didn't do what he said he did. So how do you react to that? I also have the cross-examination, and it's in the record, that he worked overtime. It wasn't part of his duties as a pourer to do the additional tasks that caused the exposure. But when he worked overtime, he was instructed by his foreman to do certain tasks like wash the buckets out with the hose, the steam hose, which he gave that history to their doctor, Dr. McCunney. Dr. McCunney was told by personnel at ADM to disregard that in his history because that wasn't part of his job duties. Well, did the company dispute this overtime, though? No, no, they didn't dispute overtime. I asked the personnel director on cross-examination. I said, if he was told to do these tasks, would he have worked overtime? Would he have done them? And he said, yes, he would have done them. I want to drag you back. They're just trying to emphasize it's not part of his job duties. I want to drag you back to exactly what this commission did with Dr. Gumpert's testimony and his opinion. Now I'm going further into the opinion that was adopted where it says, Notwithstanding, even if any recognized hazard meeting the standard for occupational disease was confirmed, the methodology employed by Dr. Gumpert to relate the occupational disease to respondent is generally accepted. In the last sentence of that paragraph says, Thus, Dr. Gumpert embraces a principle that says that smell alone enables inspiration of sufficient quantities of the compound without any scientific support for the theory. So it occurs to me that your argument is correct. That for whatever reason, the arbitrator discounted the opinions of Dr. Gumpert under a Fry analysis. So it occurs to me that, number one, we have to determine whether he was correct. And if he was incorrect, it has to go back to the commission to reconsider the decision in light of Dr. Gumpert's testimony. I think that's the only thing that can be done with it. So I think this case rises or falls, I think, if Gumpert's testimony is properly excluded, you lose. Period. Because you have no evidence. So I think this case rises or falls on whether the testimony of Gumpert's opinion was properly excluded or not. And it's just that simple. The rest is window dressing. That's what I'm trying to say. And that's the legal issue that you can decide. That's not manifest weight. But I do think we meet the manifest weight standard for reversal. Gumpert treated him eight years. Gumpert was his treating doctor. He conducted an analysis. But the reason why I'm trying to derail you from that argument is if you are correct that Gumpert's testimony was improperly excluded, then the commission has to reconsider these facts, including his testimony, and only then could we ever get to the question of if they denied benefits, whether it was against the manifest weight in light of Gumpert's testimony. So the whole case is about Frye. I mean, that's all it's about. To me, it's about Donaldson. Donaldson is our case. Frye is a 1923 federal case. Donaldson is the Illinois case that tells us everything we need to know about Frye. However, Donaldson very clearly, if you look in the evidence rules, adopted Frye and reappointed Frye. You are aware of that. It's right in the evidence rules itself. You can look it up. I mean, we are a Frye standard state. We are not a Dodd state. Frye is the analysis. So, I mean, that's what the case is about. Well, the general accepted scientific fact is that diacentral causes COPD. And the specific diagnosis of bronchial obliterans is the type of COPD. Okay, doctor, there is a difference in opinion whether or not he has bronchial obliterans. Dr. McHoney says he doesn't. Dr. Guppert says he does. Your time is up and you will have time in reply. Thank you. You'll have five minutes in reply. Counsel, you may respond. Thank you. May it please the court, counsel. First, the Frye basis for their review was not raised before the full commission and it was not raised in this manner before the trial court. And I respectfully submit it is not particularized sufficiently with question and answer in the context of his brief. Your argument is what, it's waived? It's waived. If forfeiture applies to you, we can't decide this case unless we first address the Frye issue. Then let's address it. Because what we have here, this issue is raised because they have to avoid the manifest weight standard. There are two diseases here and they are distinct diseases. They want to take the science regarding bronchiolitis obliterans and do a transference to say it's applicable to COPD. Before you get to that, can I ask for some clarification here? Mr. Calvo went through and indicated that there were notations made in the transcript of the evidence deposition, Dr. Guppert. Is that right? It is true. It's a particularized question and answer. Okay. And the decision, the arbitrator's decision, Justice Hoffman went through and read through portions of the decision. Did the arbitrator ever make an express ruling as to Dr. Guppert's opinions and as to their admission? There is no specific ruling striking Guppert's testimony as a whole. There is only particularized question and answer. We review the decision as his analysis and weighing of opinions and testimony from Dr. Guppert. Well, if he sustained an objection to the question, then the answer is not considered, right? The answer is not considered. However, I don't know which questions or answers upon which he relies for his review because he didn't put any of them in his brief. A question will arise five, six, seven times trying to get to causation through the side door, the back door, every way imaginable in the course of a two-hour deposition. How would you interpret, thus Dr. Guppert embraces a principle that says that smell alone enables inspiration of sufficient quantities of the compound without any scientific support for the theory? He rejects the smell theory of causation. Okay. But that doesn't necessarily wrap the entirety of Guppert's testimony. The smell theory of causation has no, zero published article or journal that would support it. It is based upon an odor threshold that is 7,000 times different from any toxicity threshold that has ever been measured for an exposure to diacetyl in the popcorn industry where they are dealing with large vats of, open vats of heated product with an eight-hour shift exposure to the worker compared to ADM. And these are quantitative factors that Guppert said he had no knowledge of, by the way, which goes to the foundational element of the opinion. So you're saying if we get past, I don't want to interrupt you, but if we get past the forfeiture, and I agree with Justice Alford's argument, you're saying, you're addressing now whether it would meet the Frye standard in any event, you're saying? It doesn't meet the Frye standard. I mean, I'm more than comfortable attacking that. And in fact, the Newkirk case in the Pacific Report of Washington, I believe, that is cited in our brief, the smell theory has been tried before. The smell theory has been rejected by the federal courts as junk science. It's not science at all. So we've been down this road. We have precedent saying that that is not an admissible opinion. Hold on. Let's slow down a little bit. That which is inadmissible under Daubert may very well be admissible under Frye. They have different bases, and it's a different analysis. Daubert's federal. Federal government uses Daubert. So your federal cases are based on a different standard than we employ. The other question that I have is, what are we supposed to do with statements like, premised upon the assertion that an explosion of microwave popcorn butter flavor at any level is unsafe unless the respondents can prove otherwise, has been rejected as non-scientific conclusion? I mean, I think the only fair reading of this is he discounted this man's opinions because he found they didn't comply with Frye. Or he discounted them because they were not the least bit persuasive, because in cross-examination, when you state a conclusion, you follow up with questions to test that conclusion. That's not a fair reading of this decision. A fair reading of this decision is that it's without any scientific support or theory. That is Frye. And he discounted his opinions. And he also indicates here that he did consider the admissibility of all this evidence as part of his ruling. I think the only intellectually honest argument that you can make is that it doesn't satisfy Frye and go from there. What science is there then? The record is wholly devoid of any science that would connect diacetyl with COPD. These are different lung pathologies. That's what I wanted to ask you. Didn't McCunney address whether or not a link between diacetyl exposure and COPD has been generally accepted, didn't he? And he said no. He says it is not generally accepted. That's in the record. That's in the record. That's the only expert testimony you have in this case. Do not equate. Here is the problem. This is the sleight of hand that's happening evidentiary here. COPD and bronchiolitis obliterans are two different entities. They are not the same diagnosis. They manifest themselves in different pathologies in deep lung tissue. A bronchiolitis obliterans, which is the only thing in limited case studies, still not generally accepted science. And I base that on Dr. Gumprecht's own statement as he refers to an editorial article where he tries to say, well, there is generally accepted standards. And I go, that editorial, is that generally accepted science? And he goes, it's on the way to getting to general acceptance. McCunney rejects it. Gumprecht does not unequivocally embrace it. But let's take even the science in their on the way to general accepted science. It requires a latency that is really quick with diacetyl, a six-month period of a 330-milliliter drop in FEV1. This guy never had it. In the last, diacetyl was only in this ADM plant from the early 90s. He leaves the place in 2003. In 1995, his FEV1, which is the telltale for the diminished lung pulmonary function test that they base their diagnosis on, was the same after eight years of exposure, alleged exposure, because our exposure is only four one-hundred thousandths of one percent in two to three percent of product that he can never say he actually handled anyway. And it was only at that peak concentration, when you're in the lab, a place he never worked. So we have no basis except wildly speculative grounds, which is DIVAC, which is the other Illinois cases. You cannot base a Modelsky, you cannot base a causation opinion upon such speculative grounds. And Frye set aside, there are other standards for admissibility, is that you have to have a historical foundation. Gumprecht admitted, I know none of the quantitative differences between popcorn industry and ADM. I did an audit of the plant, McConnie did. I have no idea, I accepted the history provided by Mr. Gumprecht as to the extent of his exposure. We get batch and industry or company records that show it's a seventy to one overstatement. And then, only as to volatile organic compounds of which diacetyl may or may not have been included. NIOSH was in the plant, we are clean. ADM industrial hygiene, we are clean. John Jurgiel, our independent evaluation, our plant is clean on every factor. And Dr. Gumprecht bases his entire diagnosis on an alleged decrease in PFT, which was unchanged during the period of alleged exposure. And he doesn't even know whether the baseline against which the decrement is measured included a smoker or not. We have affirmative opinion, not where we're saying, you just didn't prove your case. We have affirmative evidence from Dr. McConnie connecting his COPD to what all doctors, all people testifying, admit is the most common cause for what his lung pathology revealed, and that is smoking. Fry really, if you analyze it, addresses methodology. It does. And it's an analysis of methodology. It is not an analysis of the ultimate conclusion. The ultimate conclusion is discounted if the methodology does not satisfy generally accepted principles. But you can have two competing opinions based upon different methodology, both of which are admissible under Fry. So now the question becomes, what exactly was Gumprecht's methodology that was rejected? There was none. He compared PFTs. He didn't even know the basis for the PFTs, what standards it was set, what baseline formed the basis, smokers or nonsmokers. He didn't even know it was a Newton 83 standard. He didn't know that it was nonsmokers included. He did not consider a 50-pack year smoking history, commencing with two packs a day at age 15. His methodology, just to compare pulmonary function tests, all post-employment, and not comparing the pulmonary function test you had immediately before the alleged exposures and immediately after the alleged exposures, and they were the same. There's no methodology at all. He has no baseline. He's just saying, I've got a 50 to 80-pack year smoker who has COPD. But there's no methodology that takes any scientific link and pulls in diacetyl. Diacetyl is not recognized as causing the bronchiolitis obliterate or, excuse me, COPD. What did Dr. Gumprecht say? Did he refer to some editorial? So what was his baseline for saying this was accepted? He goes to the Price editorial, which he says is on its way to general acceptance, but they had a gold standard buried in it. And that is because of latency, which caused me to ask Gumprecht, well, what is the latency from exposure to symptom onset if caused by the diacetyl? I don't know, but there has to be one. He couldn't even give us within a range of a decade what it would be. But the Price article says that within a six-month period, you would have a 330-milliliter drop of FEV1. That is the sign because of the nature. If diacetyl actually gets inspired into the deep lung tissue, which scientifically it doesn't because it's highly water-soluble, it's going to irritate eyes and nose, and Durbin never had those complaints. For 20 years, he never reported them to a doctor. So, again, tying ourselves to the science, if he was having a diacetyl exposure, he's going to have upper airway and eye irritation. Yeah, but again, we're getting far afield. We're talking about meeting the Price standard for visibility. So Gumprecht said something about an editorial? Which Propella says is not generally accepted, and which Gumprecht said is not yet generally accepted. So I have no foundation of any generally accepted science that says diacetyl to COPD exists. There's no evidence in this record. Gumprecht said it was not accepted, acknowledged it wasn't accepted yet, generally? Yeah, he says it's on its way to general acceptance. That's a quote? Pardon me? Is that a quote? That's a quote. Now, on the question of if a methodology is found not to be generally accepted, or based on generally accepted principles, is that conclusion reviewed on a manifest weight standard, or as a matter of law? Any legal ruling on the basis of the admissibility of evidence is an abuse of discretion standard. That's the admissibility. I'm talking about the ruling on the question of whether it is or is not generally accepted. That underlies abuse of discretion standard. That, I would submit, is in the discretion of the court to determine, which would be akin to... It's a fact question. He has to resolve a fact question. If he was resolving a fact question, it has to be manifest weight. It is a fact question. So... I mean, is it generally accepted or not? That is not a legal... That would have to be a fact question. It's a fact question. Mr. Stokes, I'm still having trouble identifying the landscape here that we're to operate in. The arbitrator did not strike Dr. Gumprecht's testimony as a whole. Correct. And we are to identify, if he did determine that he was not going to consider certain evidence due to Frye, we are left to determine which portions of his testimony he did not consider. Is that correct? Well, I don't believe it's the role of the reviewing court to do that level of work. If the record supports affirmance of the circuit court, the commission, and the arbitrator, for any basis in the record, they are to be affirmed. It seems like now the appellant has come forward and said, look at this record and find some reason that I can avoid the manifest weight argument and reverse it. So, in a sense, the arguments have taken a little right turn from what I expected was coming here. What you're saying is that Dr. McHenry is sufficient? He is. Okay. To defeat reversal on manifest weight? He is. And very radically, he affirmatively found a non-reversal. Hypothetically, assuming that the arbitrator took into consideration all of the evidence, even that which arguably perhaps was stricken as inadmissible. It's like saying I didn't hear the bell ring. Do you mind if I ask a question? I know the red light is on here. No, I'm still in my question. Oh, sorry. Okay. That even if the arbitrator considered that, you still, under manifest weight of the evidence, suggest this should be affirmed? That is correct, Your Honor. Okay. I just want to summarize. Go ahead. One other question. Within the arbitrator's decision is this statement, the preponderance of evidence is against the opinions provided by Dr. Gumbrich. How are we to interpret that statement? That he considered the totality of the record, everything he heard. Certainly he is giving lesser weight to Gumbrich in part because we have challenged its scientific validity. Then he didn't exclude it under Frye. You can't have it both ways. Yes, you can. You can say that an opinion is weak because the science is shaky. You most certainly can. Yeah, but that doesn't defeat its admissibility. He hasn't stricken it. He has not stricken its admissibility anywhere in this record. If you are going to rely upon that basis, I can't speculate upon his basis. What he says is that it's scientifically weak. And by the way, factually, when you compare the opinions, it's weak as well. But for him to express that, for an opinion to be strong, there has to be a scientific basis. And this has no scientific basis, which I continue to concur. There is no scientific basis in this record to support a link between diacetyl and COPD. And he doesn't have bronchiolitis obliterans. The only thing where there could be any stretch to say that there is a sliver of science to support. Okay. Your time is up. We gave the Closing Council a little more time when their life came on, but you have five minutes in the clock. What Dr. Dunford says is that not only does the petitioner have COPD, but he has COPD and bronchiolitis obliterans. Okay. He says the x-rays are blurry. You can't see the specific little sacs that indicate bronchiolitis obliterans. He sends information to Dr. Parnatt, who is the doctor who determined at the popcorn factory that the diacetyl was the cause of the lung disease. Dr. Parnatt writes back that he agrees with his conclusion that diacetyl caused this guy's condition. He says the way to find out for certain if he has bronchiolitis obliterans, although Dr. Parnatt agrees with Dunford, is to do a lung biopsy. Dr. Dunford on cross-examination says the reason I didn't do the biopsy is because it's not part of the medical treatment to treat my patient. In other words, he wasn't hired by me. He wasn't hired by ADM. Mr. Durbin was referred by his asthma doctor in Decatur to Dr. Dunford in Springfield because he couldn't diagnose what was going on with his patient. Obviously, he's got COPD. Every person in this popcorn factory that had bronchiolitis obliterans had COPD. It's just a kind of COPD. It's not that it's not COPD. COPD can be caused by cigarette smoking. In this case, Dr. Dunford said part of it was cigarette smoking. But he felt the majority or part of the causal connection was the exposure to diacetryl. And the science is clear. Diacetryl causes lung disease. The issue is a factual issue with Dr. Dunford and Dr. McKinney is whether or not he has bronchiolitis obliterans. And that goes to the weight of the evidence in terms of the prior effect. It's not a legal issue. We don't need science to say that you have to have an x-ray showing the little bubbles or you don't have bronchiolitis obliterans. There's a disagreement between experts that you can have COPD, you can be exposed to diacetryl, that you may have bronchiolitis obliterans. We may not know until we do tests on you when you're dead. Because a lung biopsy is an invasive process that could cause an infection, especially in somebody as ill as Mr. Durbin is, who's been on permanent disability, retired on disability from ADM, and has been on disability three years, and has other conditions besides the COPD and bronchiitis. What are we supposed to do with this case if we can't figure out what the commission did on the question of Frye? Whether they did not consider Dunford's opinion because he didn't satisfy the Frye standard, or whether... whether they did not consider on the proposed decision, which is his notes on the record, on every causal connection question, that he sustained the 702 objection. The reading of his decision is almost like the guy that argues to the jury, I never shot the defendant, but if I did, it was self-defense. I mean, can you have it both ways? Can you discuss the admissibility of evidencing it, no factual foundation, and then the next breath talk about preponderance? I don't think this court can get past, if it decides on the petitioner's basis that Frye doesn't apply or Donaldson doesn't apply, then it's got to remand the case to the commission to consider the entire record and the evidence. Well, I mean, yes, if we decided he incorrectly struck the opinions of Dunford under Frye, it has to go back for the commission to reconsider all of the evidence, including Dunford's opinion. But that wasn't really my question. My question is, what if we can't figure out what he did? Then what do we do with it? Well, you remand it. And tell him what? Tell him to, you know, figure out what he did. All right, okay. You know, the man's still alive. Okay. Well, thank you, Counsel Bolden, for your arguments in this matter. This morning we'll be taking our advisement. A written disposition shall issue.